# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA )
ex rel. JOHN EBERT, )
      )
     Petitioner, )
      )
      )    **No. 03 C 1553**
     v. )
      )    **Judge Joan H. Lefkow**
DONALD HULICK, Warden,[1] )
      )
     Respondent. )
      )

## MEMORANDUM OPINION AND ORDER

This habeas petition is before the court on remand from the court of appeals for

reconsideration of John Ebert's claim of ineffective assistance of counsel. The court of appeals'

unpublished order, *Ebert* v. *Uchtman*, No. 04-3966 (7th Cir. April 28, 2005) ("the Order"), is a

review of this court's dismissal of Ebert's petition on all of his claims, *United States* ex rel. *Ebert*

v. *Hinsley*, No. 03 C 1553, Dkt. No. 16, Mem. Op. and Order of Aug. 18, 2004 (published at

2004 WL 1878314) ("the August 2004 Decision"). In the August 2004 Decision, this court

relied in part on *Holman* v. *Page*, 95 F.3d 481 (7th Cir. 1996), which ruled that "no prejudice

exists when evidence gathered in violation of the Fourth Amendment is erroneously admitted at

trial." *Id.* at 492. Rather, the petitioner was required to demonstrate that counsel's overall

incompetence, as evidenced by the failure to seek exclusion of evidence, rendered the

---

[1] Donald Hulick is the current Warden of the Menard Correctional Center and is thus the proper respondent in this habeas corpus action. *See* Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts. The court therefore substitutes Hulick as the respondent. *See* Fed. R. Civ. P. 25(d) (an order of substitution may be entered at any time).

proceedings unfair or unreliable. August 2004 Decision at 11. Three months after the August 2004 Decision, the court of appeals overruled *Holman*. *Owens* v. *United States*, 387 F.3d 607 (7th Cir. 2004), held that failure to make a Fourth Amendment objection to admission of evidence can amount to ineffective assistance of counsel, even if the evidence was reliable and its admission created no risk that an innocent person would be convicted. *Cf. Holman*, 95 F.3d at 491 ("It is inconsistent with the function of the exclusionary rule to permit a criminal defendant on federal habeas review to claim prejudice because but for counsel's incompetence on the suppression issue he would have gotten away with the crime.").

The Order of remand explains, "The district court relied on [*Holman*] and concluded that Ebert could not demonstrate prejudice for counsel's alleged error. . . . Because the district court decided this claim under *Holman*, the record is not developed on the Fourth Amendment claim." Order at 1–2. The court of appeals remanded for reconsideration of the ineffective assistance claim. Order at 2. In all other respects, Ebert's application for a certificate of appealability was denied, foreclosing his other claims for habeas relief. *Id.*

This decision incorporates the legal standards, facts, and procedural history set out in the August 2004 Decision and repeats or elaborates only as necessary to develop the record on and decide Ebert's ineffective assistance claim in light of *Owens* and other governing law.

## FACTUAL BACKGROUND

The following summary of facts is derived from the state court opinions, particularly the Illinois Appellate Court's opinion regarding Ebert's second appeal, *People* v. *Ebert*, No. 1-98-3650, at 3–8, 10–12 (Ill. App. Ct. 1st Dist. Feb. 29, 2000) (unpublished order) (Respondent's Ex. D) (hereinafter "Ill. App. Ct. Op. II").

2

On March 1, 1992, police received reports that two men had been murdered in their second floor apartment at 4358 South California Avenue in Chicago. William Moser, a detective with the Chicago Police Department, testified that he reported to the scene at 4:30 p.m. that day and proceeded to the second floor. In the common area of the second floor apartment Moser found the body of Frank "Franco" Svec, who appeared to have been stabbed to death. The room was in disarray, as if a struggle had occurred, and blood was splattered on the walls and the floor. In one of the three bedrooms, he also found the body of Albert Jevorutsky, who also appeared to have been stabbed to death. Moser observed that the second bedroom, which had belonged to Svec, was also in disarray; all of the dresser drawers had been taken out and dumped onto the bed and the floor. The third bedroom, which belonged to a man named Bobby English, was tidy and did not appear to have been disturbed.

Nancy Jones, an Assistant Medical Examiner for Cook County, testified that both victims died as a result of multiple stab and incise wounds. Both also had defensive wounds on their hands.

Sharon Brasher ("Brasher") testified that on the night of the murders she was and had been residing in the first floor apartment at 4358 South California Avenue with her daughter, Michelle Brasher, her son, Michael Brasher ("Michael"), and her boyfriend, James Maynard ("Maynard"). Their first floor apartment had once been a tavern. Svec, Jevorutsky, and English lived upstairs. At around 8:00 p.m., Brasher went to a Mardi Gras celebration at a church across the street with her daughter, Svec, English, and Maynard. Brasher drank alcohol and Svec, who always had a lot of cash on hand, paid for everything. Brasher went home around 11:00 p.m. and went to sleep, as did her daughter and son. During the night, Brasher's daughter woke her up and

3

said that she heard a loud noise upstairs. Brasher told her to go back to sleep. Brasher woke up again later when her daughter opened the front door. Maynard had come home and was covered in blood. Maynard told Brasher that he had just killed two people and that he had "liked it." He threw about $300 in cash on the floor and gave part of it to Brasher. After Maynard had changed his clothes, Brasher followed him out the door and saw Ebert outside. Ebert was standing facing the building and called out "Franco" several times before he and Maynard left. Brasher testified that Maynard had come home between 2:30 and 3:00 a.m., stating that she "automatically" looked at a large, illuminated bar clock hanging on the wall. A day or so later, Brasher joined Maynard, English and another woman at a motel, where they drank and used cocaine. On the walk back from the motel the next day, they went to a nearby Taco Bell, where English retrieved a pillow case full of coins from underneath a staircase. The coins were exchanged for paper money, which was divided between English and Maynard. Brasher also testified that prior to the defendant's trial, she was tried and convicted for concealing the two murders, having initially lied to police in connection with these events.

Michael testified that on February 29, 1992, he came home to an empty apartment and that his mother and sister returned around 11:30 p.m. Around 2:00 a.m., he awoke when Maynard knocked at the door. Michael's sister opened the door. Maynard and English came inside, went over to the door that leads from the tavern into the stairwell, and attempted to open it. Michael then went back to sleep and did not see whether Maynard and English opened the door or not. He also testified that his mother was "kind of drunk" when she returned home from the Mardi Gras celebration.

4

Jackie Thursby, an Assistant State's Attorney for the Cook County State's Attorney's Office, testified that she interviewed Ebert at a police station on May 2, 1992, at which time he confessed to his participation in the robbery of Svec and Jevorutsky. In the confession, which Thursby read to the jury, Ebert stated that on March 1, 1992 at 5:00 a.m., he was outside of 4358 South California with Maynard. Ebert yelled up to English to let him up and then went upstairs with English and watched television. Svec and Jevorutsky were asleep in their rooms. A short while later, Maynard asked to be let upstairs and said that he needed money. Maynard proposed that they rob Svec and kill him if necessary. Ebert agreed that they should rob Svec. Ebert then went into Svec's room and started going through drawers, at which time Svec woke up and began shouting at him. Ebert chased Svec out into the living room, where Maynard hit and punched Svec, knocked him down to the floor, and began kicking him in the head. Ebert returned to Svec's room to search for money and English came in and took some coins. Ebert heard Jevorutsky screaming in his room. He looked out and saw Maynard kicking Jevorutsky. Ebert then returned to Svec's bedroom and started dumping out drawers in search of money. Maynard came in and Ebert showed him a drawer full of knives. Maynard took a knife and went back to Jevorutsky's room with English. Ebert found $900 in Svec's room, which the three split up on Svec's bed. English gave Ebert a white plastic bag with knives in it and told him to throw it away. Ebert then suggested that they break the lock on the front door in order to simulate a robbery. Maynard proceeded to break the lock. They agreed to meet later at a White Castle, and en route Ebert dropped the knives at a city garbage dump on 44th Street.

A number of additional witnesses also testified at Ebert's trial, but because their testimony has little, if any, relevance to the issues presently before the court, it need not be recited here.

## PROCEDURAL HISTORY

Prior to his first trial, Ebert's counsel brought a motion to suppress his confession, arguing that the police lacked probable cause for his arrest. After an evidentiary hearing, the trial court denied the motion. The appellate court upheld this ruling. The legal standard was consistent with federal law:

> In order to have probable cause to arrest, police need to have knowledge of facts which would lead a reasonable person to believe that the defendant has committed a crime. (*People* v. *Eddmonds* (1984), 101 Ill. 2d 44, 461 N.E.2d 347.) A determination of probable cause is governed by common-sense, practical considerations not by technical legal rules. (*People* v. *Mitchell* (1970), 45 Ill. 2d 148, 153–54, 258 N.E.2d 345.) While probable cause requires more than mere suspicion, it does not require sufficient evidence to convict. (*People* v. *Moody* (1983), 94 Ill. 2d 1, 445 N.E.2d 275.) The existence of probable cause is determined by examining the totality of the circumstances at the time of the arrest. (*Illinois* v. *Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317.)

Ill. App. Ct. Op. I, at 12. The appellate court explained that the trial court's finding of probable cause for Ebert's arrest was based largely on two pieces of information:

> [1] Michael Brasher told investigating officers that Maynard, known to officers as a downstairs resident of the victims' apartment building who was seen with one of the victims on the night prior to his murder, had told Michael on an unspecified date after the murders that the defendant was one of three people involved in the murders. Michael also told the officers that early on the morning of March 1, 1992, he was awakened when Maynard and English entered the apartment building and proceeded upstairs to the victims' apartment. Later that day, Brasher gave Michael $50, told him not to ask where it came from and asked Michael to dispose of Maynard's blood-stained cowboy boots.
>
> \* \* \*
>
> [2] [T]he police also had the statement of [Dolores] Esparza . . . . Esparza told investigating officers that she observed Maynard, English, defendant and Brasher enter a basement apartment. [Detective] Carroll testified that Esparza was confident that the aforementioned were the only people present in the apartment when she thereafter

overheard a conversation therein during which three male voices discussed the murder of two old men. The men talked about how they had robbed and killed two old men and described how the victims bled like "stuffed pigs."

*People* v. *Ebert*, No. 1-94-0013, at 12 (Ill. App. Ct. 1st Dist. Feb. 2, 1996) (unpublished order) (Petitioner's Ex. P) (hereinafter "Ill. App. Ct. Op. I"). Ebert argued on appeal that these statements did not provide probable cause for his arrest because they were based on unreliable hearsay statements of Michael and a witness who overheard a conversation among three unidentified men. Ebert contended that the information from Michael was unreliable because (1) Michael had made inconsistent statements to the police regarding the murders, (2) Michael's mother, Sharon Brasher, was a suspect,[2] and (3) Maynard, with whom Michael lived, was a suspect.

The appellate court pointed out that "probable cause may be founded upon evidence, such as hearsay, which would not be admissible at trial." Ill. App. Ct. Op. I, at 13 (citing *People* v. *Hoover*, 620 N.E.2d 1152, 250 Ill. App. 3d 338 (Ill. App. Ct. 1st Dist. 1993)). Concerning Michael's reliability, the court noted that "[w]hile officer Carroll testified on cross-examination that Michael had provided inconsistent statements to police, there was no elaboration in the evidence as to the nature of the inconsistency so as to provide any basis for questioning the reliability of the testimony at issue." *Id.* at 15. The court further found that Michael was not shown to have been a professional police informant, and "was therefore a citizen informant and presumptively reliable." *Id.* at 14 (citing *People* v. *Hall*, 518 N.E.2d 275, 164 Ill. App. 3d 770 (Ill. App. Ct. 1st Dist. 1987)). The appellate court also found that Ebert had not provided support

---

[2] Brasher was tried and convicted for her role in concealing the two murders. Ill. App. Ct. Op. I, at 8.

for his contention that Michael's relationship to Brasher and Maynard had altered this presumption of reliability. On the contrary, the appellate court emphasized, "Michael provided [inculpatory] information concerning Maynard's activity on the morning of the murders, the disposal of Maynard's blood-stained boots and Brasher's suspicious $50 gift to Michael. This information arguably implicated those that the defendant suggests Michael would fabricate to protect and therefore bolstered his credibility." *Id.* at 14–15 (citing *United States ex rel. Saiken v. Bensinger*, 489 F.2d 865 (7th Cir. 1974)).

Also, with regard to Maynard's reliability, the appellate court found that "[Maynard's] statement to Michael implicating [Ebert] served to neither exculpate or inculpate himself in the crimes," as "Maynard had merely commented that defendant was one of three people who had committed the crime." *Id.* at 15. Accordingly, the court found that "Maynard's omission of any information regarding his involvement in the crime or complete lack thereof does not serve to indicate a lesser or greater degree of reliability." *Id.*

Finally, the appellate court noted that "in addition to Michael's statement, the police also had the statement of Esparza upon which to rely in effectuating the arrest of the defendant." *Id.* at 16. The appellate court thus found that the statements by Michael and Esparza, "when viewed in combination with the other information known to the police, support[], at least minimally, a reasonable belief that the defendant was involved in the murders." *Id.* at 16. Nevertheless, the court reversed Ebert's convictions on separate grounds and granted him a new trial.[3]

---

[3] The Illinois Appellate Court reversed Ebert's conviction on the grounds that he had been denied effective assistance of counsel because his trial counsel had (1) failed to interview a crucial witness prior to trial, (2) initially used a compulsion defense that was statutorily prohibited, and (3) switched, during the middle of the trial, to an alibi defense.

On remand, Ebert's counsel did not renew the motion to suppress Ebert's confession or otherwise relitigate the issue of whether the police had probable cause to arrest him. At the conclusion of the second trial, Ebert was convicted on two counts of murder and one count of armed robbery.

On appeal of those convictions, Ebert argued, *inter alia*, that his trial counsel's failure to bring a renewed motion to suppress his confession constituted ineffective assistance of counsel. Ebert particularly emphasized that his trial counsel had failed even to investigate two later statements of Esparza in which she allegedly contradicted the hearsay statements attributed to her by the police officers at the suppression hearing prior to Ebert's first trial:

> One [of the two later statements purporting to be from Esparza] indicates that English was not present at the conversation about the murders, but that Michael Brasher was. The other, which is unsigned, denied that Esparza heard Maynard talking about the killings, but states that she heard Maynard discussing how a pig bleeds when its throat is slit.

Ill. App. Ct. Op. II, at 15.

The appellate court analyzed the issue under *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), which requires, in its first prong, that the defendant's counsel was deficient. In other words, the defendant must "'overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" Ill. App. Ct. Op. II, at 14–15 (quoting *Strickland*, 466 U.S. at 689–90). The appellate court determined that "[d]efense counsel may well have made a tactical decision that further investigation would be fruitless, given the other evidence of probable cause." *Id.* at 15. As the court explained, citing a number of Illinois decisions, hearsay can provide grounds for probable cause, *id.* (citing *People* v. *Hoover*, 620 N.E.2d 1152, 250 Ill. App. 3d 338 (Ill. App. Ct. 1st Dist.

9

1993)), and "[p]rovided that the person supplying the data is a citizen-informer and not a police informer, the police do not have to establish the informer's prior reliability or to corroborate the information. . . . Moreover, even information from a suspect which implicates another provides sufficient grounds for probable cause if buttressed by corroborating evidence or by the officer's knowledge and experience." *Id.* at 15–16 (quoting *People* v. *Johnson*, 544 N.E.2d 392, 187 Ill. App. 3d 756 (Ill. App. Ct. 1st Dist. 1989)).

The appellate court then turned to the second prong of *Strickland*, which requires the defendant to show that counsel's deficient performance prejudiced him. The court found that there was not "a reasonable probability that the final result in this case would have been different had defense counsel investigated further and made a motion to suppress." *Id.* at 16. The court based this finding, in part, on the "'law of the case' doctrine," under which the court is "bound by the particular views of law announced in our prior opinion in this case, unless facts presented in the subsequent proceedings are so substantially different as to require a different interpretation." *Id.* at 16–17 (quoting *People* v. *Weinger*, 428 N.E.2d 924, 937, 101 Ill. App. 3d 857 (Ill. App. Ct. 1st Dist. 1981)). The court referred to the same evidence on which it rested its conclusion on the first appeal that probable cause existed:

> The police had two pieces of information on which to base their determination of probable cause, statements by Michael Brasher and Esparza. In a prior appeal this court found that as a citizen informant Michael Brasher was presumptively reliable. Furthermore, the new statements by Esparza do not negate the earlier testimony by a police officer that she originally told him she overheard a conversation about a murder. Therefore we hold that even if Esparza subsequently attempted to retract her earlier statement that she overheard a conversation about a murder, the earlier statement can still be used to support a finding of probable cause.

*Id.* at 17. On this basis, the appellate court concluded that Ebert failed to meet the *Strickland* test for establishing ineffective assistance of counsel.

## ANALYSIS[4]

Ebert argues that, under *Strickland*, his trial counsel's performance constituted ineffective assistance of counsel when he failed to either (a) investigate the statements of Dolores Esparza or (b) relitigate, prior to Ebert's second trial, the issue of whether police had probable cause to support the arrest that resulted in his confession. Under the analysis established in *Strickland*, a defendant must show both (1) "that counsel's performance was deficient" by showing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) "that the deficient performance prejudiced the defense." 466 U.S. at 687; *accord Owens*, 387 F.3d at 609.

Ebert now argues, as he did in the appellate court, that his trial counsel's performance was deficient when he failed to interview or otherwise investigate Esparza, one of the two primary sources of information that the state courts cited as providing probable cause for Ebert's arrest.[5] He cites *Kimmelman* v. *Morrison*, 477 U.S. 365, 106 S. Ct. 2574, 91 L. Ed. 2d 305

---

[4] Due to the organization of Ebert's opening memorandum (Dkt. No. 43), which presents all of his numerous arguments in a single, lengthy block of discussion, without section breaks or headers, it is often not entirely clear where one line of argument ends and the next begins. Nevertheless, the court has attempted to address each of his arguments in the order they were presented. To the extent that any point made by Ebert is not specifically addressed here, the court has determined that such a discussion was not necessary.

[5] Ebert similarly contends that his trial counsel's failure to renew the motion to suppress cannot be considered—as the Illinois Appellate Court suggested—a "tactical decision," Ill. App. Ct. Op. II, at 15, because there was no possible negative impact that could have resulted from such a hearing. Although this is a sound argument, the appellate court's observation to that effect did not affect its analysis of the central issue of whether the Fourth Amendment claim was sufficiently substantial that the failure to make the claim was prejudicial to the defense.

(1986), where the habeas petitioner's claim of ineffective assistance rested entirely on his counsel's failure to make a timely motion to suppress evidence based on an allegedly unconstitutional search and seizure. *Id.* at 371–73. In *Kimmelman*, the Supreme Court held that counsel's failure to make a timely suppression motion was ineffective assistance where counsel had "neither investigated, nor made a reasonable decision not to investigate, the State's case through discovery" prior to the petitioner's trial on rape charges. *Id.* at 385. The Court explained in *Kimmelman*, "Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." 477 U.S. at 375.

Ebert contends that his Fourth Amendment claim is meritorious because the information the state court relied on in finding probable cause for Ebert's arrest was unreliable. Ebert attacks both of the bases cited by the Illinois Appellate Court: (1) Maynard's statement to Michael and (2) the conversation that Esparza overheard. Had the confession that resulted from his arrest been suppressed as it should have been, Ebert contends, the remaining evidence against him would have been insufficient to support his conviction.

In *Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983), the Court in the context of a search warrant "reaffirm[ed] the totality-of-the-circumstances analysis that traditionally has informed probable cause determinations":

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a

fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed.

462 U.S. at 238 (internal quotation marks omitted). The central issue on this petition, then, is

whether, if one assumes that Esparza would have repudiated her statement to the police had

counsel called her to testify at a suppression hearing, would a Fourth Amendment challenge have

been meritorious such that the appellate court's conclusion to the contrary is not only incorrect in

the view of this court but "well outside the boundaries of permissible differences of opinion."

August 2004 Decision at *1 (quoting *Hardaway* v. *Young*, 302 F.3d 757, 762 (7th Cir. 2002)).

Ebert cites *Harris* v. *Cotton*, 365 F.3d 552 (7th Cir. 2004), which concerned the habeas

petition of a murder defendant who had unsuccessfully argued self defense. The Seventh Circuit

reversed the district court's denial of the writ, holding that defense counsel's failure to obtain a

toxicology report showing that the victim was under the influence of alcohol and cocaine at the

time of death constituted ineffective assistance of counsel. The Seventh Circuit found that the

state court had "identified the correct legal standard—that of *Strickland*—but unreasonably

applied it. Despite recognizing the critical importance of the victim's behavior, the state court

did not find prejudice." *Id.* at 557. As the Seventh Circuit explained, because of counsel's error,

"the jury was left with the impression that the decedent *was not intoxicated* when, in fact, he was

quite inebriated. If the jury believed that [the victim] was sober, there is a reasonable probability

that they would not have believed [the defendant's] version of events as it related to [the

victim's] behavior." *Id.*

Ebert argues that "[i]t is possible that each of these deficiencies are presented by Ebert's

Petition." Petitioner's Mem. at 18. He contends that, "[f]or example, any consideration of

13

Michael Brasher as a 'presum[p]tively reliable citizen informant' under these facts cannot be defended as [1] the [appellate] court failed to offer an appropriate explanation and [2] he fails to meet the usual legal criteria which requires the informant to be disinterested with no stake in the outcome." *Id.*

The facts presented in *Harris* are readily distinguishable from this case, and Ebert has failed to identify any other legal precedents that cast doubt on the Illinois Appellate Court's analysis of these issues. With respect to Ebert's first point, the "[t]he [Supreme] Court has . . . proceeded as if veracity may be assumed when information comes from the victim of or a witness to criminal activity, a position rather consistently taken by lower courts." WAYNE R. LAFAVE, JEROLD H. ISRAEL, & NANCY J. KING, CRIMINAL PROCEDURE § 3.3(d), at 152 (4th ed. 2004) (citing *Chambers* v. *Maroney*, 399 U.S. 42, 90 S. Ct. 1975, 26 L. Ed. 2d 419 (1970)). Such cases holding that veracity was properly presumed often emphasize that "the police were unaware of any apparent motive to falsify." *Id.* § 3.3(d), at 152. Likewise, in this case, the Illinois Appellate Court rejected "defendant's contention that Michael's relationship to Brasher and Maynard fatally diminished his reliability."[6] Ill. App. Ct. Op. I, at 14. As the Illinois Appellate Court explained, Michael's disclosures to the police regarding "Maynard's activity on the morning of the murders, the disposal of Maynard's blood-stained boots and Brasher's

---

[6] Although this language comes from the appellate court's opinion on Ebert's appeal of his conviction at the *first* trial, the appellate court's ruling on Ebert's appeal of his conviction at the *second* trial adopted its findings from its previous opinion with respect to probable cause: "Under the 'law of the case' doctrine, this court is bound by the particular views of law announced in our prior opinion in this case . . . . We do not believe that the facts relating to the issue of probable cause for the arrest of defendant would be substantially different even if defense counsel had further investigated E[spa]rza's statements." Ill. App. Ct. Op. II, at 16–17 (internal quotation marks and citations omitted).

suspicious $50 gift to Michael[,] . . . arguably implicated those that the defendant suggests Michael would fabricate to protect and therefore bolstered his reliability." *Id.* at 14–15. Thus, contrary to Ebert's point, the appellate court did address the potential implications that Michael's relationship to Brasher and Maynard might have had on his credibility, finding that, in light of all the circumstances, Michael had no apparent motive to lie to the police.[7]

Ebert has also supplemented the record with the transcript of Maynard's testimony to the grand jury on April 24, 1992, in which Maynard claimed that English had told him in confidence that English had robbed and killed Svec and Jevorutsky. Ebert argues that "directly contrary to the appellate court's observation about 'Maynard's reliability [that] his statement to Michael implicating [Ebert] served to neither exculpate or inculpate himself in the crimes,' it was within the detectives' knowledge that [Maynard] had done exactly that while implicating English a week before they interviewed Michael." Petitioner's Mem. at 20 (quoting Ill. App. Ct. Op. I, at 15). Ebert's presentation of evidence that Maynard made ostensibly exculpatory, unreliable statements to the grand jury, however, does not require the conclusion that Maynard's "statement *to Michael* implicating the defendant" was unreliable. For, as the appellate court pointed out,

---

[7] Ebert also suggests that the Illinois Appellate Court improperly ignored indications that Michael was unreliable, citing the Illinois Appellate Court's observation that "[o]n cross examination, [Detective] Carroll testified that Michael had given inconsistent statements to police during the course of their investigation." Ill. App. Ct. Op. I, at 4. As the appellate court noted, however, it is unclear in what respect or to what degree Michael's statements to police were inconsistent. *See id.* at 15. Without such elaboration, the mere fact that Michael's statements to the police were not entirely consistent over the course of their investigation does not mean that his particular statements implicating Ebert were unreliable for purposes of establishing probable cause. *See Smith* v. *Gomez*, No. 04 C 114, 2006 WL 2845697, at *6 (E.D. Wis. Sept. 29, 2006) ("[A] victim or eyewitness' report does not have to be 'unfailingly consistent to provide probable cause.'") (quoting *Spiegel* v. *Cortese*, 196 F.3d 717, 725 (7th Cir. 1999).

Maynard's statement to Michael, unlike his testimony to the grand jury, did not serve to exculpate himself.

Ebert also contends that "[w]hen Michael Brasher identified Ebert as a person Maynard claimed was involved, it was as if the police were speaking with Maynard who was shifting the blame but maintained his silence to protect himself." Petitioner's Mem. at 20. Ebert has failed, however, to specify any relevant authority to support either this interpretation of the evidence or his further suggestion that "[t]his cannot qualify as the type of corroboration long-required by Supreme Court precedent." Petitioner's Mem. at 20.

For example, Ebert cites *Lee* v. *Illinois*, 476 U.S. 530, 540–42, 106 S. Ct. 2056, 90 L. Ed. 2d 514 (1986), to support his contention that the appellate court "seized upon [Maynard's statement to Brasher] without any reasonable basis to credit it as reliable or accurate[, which] amounts to nothing more than lip-service to the courts' own obligation to adhere to the totality of the circumstances test." Petitioner's Mem. at 21. As Ebert points out, in *Lee*, the Supreme Court held that "the confession of an accomplice[] was presumptively unreliable." 476 U.S. at 539. *Lee*, however, was a "case involv[ing] the use of a codefendant's confession as substantive evidence against [the] petitioner," and the Court's reasoning was based on the Confrontation Clause, which secures a criminal defendant's "right to confront and to cross-examine witnesses." *Id.* at 540. The Confrontation Clause is, of course, inapposite to this case, because Maynard's statement to Michael was not admitted as substantive evidence against Ebert but, rather, as hearsay evidence at a suppression hearing. *See United States* v. *Harris*, 403 U.S. 573, 584, 91 S. Ct. 2075, 29 L. Ed. 2d 723 (1971) (finding that a precedent case that "rested on the Confrontation Clause of the Sixth Amendment . . . seems inapposite to . . . proceedings under the

16

Fourth Amendment"); *see also Illinois* v. *Gates*, 462 U.S. 213, 241, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983) ("[E]ven in making a warrantless arrest an officer may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.") (internal quotation marks omitted). Furthermore, it is not clear that Maynard's statement to Michael is analogous in any meaningful sense to the confession at issue in *Lee*, where the defendant's accomplice implicated himself and the defendant only after an officer read him his rights and confronted him with his alleged participation in the murders. *See* 476 U.S. at 532–33 ("[T]he *arrest statements* of a codefendant have traditionally been viewed with special suspicion.") (internal quotation marks omitted) (emphasis added). Here, Maynard made the statement to Michael in the context of a private conversation, outside the confines of a police station, and there is no indication that Maynard had reason to believe that Michael was, or would be, relaying Maynard's comments to police investigators. *See* Petitioner's Mem., Ex. O (Dkt. No. 65), at A-58, A-115.

Ebert also cites *Burt* v. *Uchtman*, 422 F.3d 557, 566–69 (7th Cir. 2005), and *United States ex rel. Hampton* v. *Leibach*, 347 F.3d 219 (7th Cir. 2003), both of which, he argues, "require that this matter be returned to the state courts for the requisite hearing as to the existence of probable cause." Petitioner's Mem. at 23. In *Burt,* the Seventh Circuit considered whether defense counsel's failure to request a competency evaluation at the time habeas petitioner Burt pleaded guilty constituted ineffective assistance of counsel. 422 F.3d at 559. Charged with two murders and facing the possibility of a death sentence, Burt had initially gone to trial before a jury, "but near the end of the state's case-in-chief he abruptly changed his plea to guilty without

any concessions from the government and against the strenuous advice of his attorneys." *Id.* As the court explained:

> During the more than 14 months between his arrest and guilty plea, Burt was taking a number of powerful psychotropic medications prescribed for him by prison doctors. Burt was examined by a psychologist eight months before his trial began, and the doctor, while noting several psychological impairments, deemed him fit to stand trial. The psychologist, however, did not consult Burt's medication records and his report mentions only in passing that Burt was even on medication. Neither defense counsel nor the trial court ever requested a further evaluation to determine if Burt was competent at the time he pleaded guilty.

*Id.* In reversing the district court's denial of Burt's habeas petition, the Seventh Circuit highlighted that Burt's attorneys were "aware of several pieces of information beyond what was available to the trial court that should have alerted them to the need for a new competency hearing," including the fact that "Burt insisted on changing his plea to guilty largely because he was not permitted to smoke in the Stephenson County Jail, and was anxious to return to prison where smoking was permitted. . . . Burt's desire to have a cigarette, in counsel's mind, trumped his desire to defend himself against capital murder charges."[8] *Id.* at 567.

Ebert contends that just as there was a reasonable probability that Burt would have been found unfit had a hearing been held, there is a reasonable probability that Ebert's confession would have been suppressed had his trial counsel requested a rehearing of the motion. Ebert's reliance on *Burt* ultimately relies on his argument that the initial hearing on his motion to suppress "occurred years earlier and was clearly deficient under *Illinois* v. *Gates*." Petitioner's

---

[8] The court also emphasized that counsel was aware that Burt (1) was "heavily medicated" on powerful psychotropic medications both before and at the time of trial, (2) "reported fearing imaginary snakes in his cell," and (3) "had difficulty staying awake during trial." *Id.* at 569. Additionally, the Seventh Circuit noted that counsel was unaware of a then-existing Illinois law that provided a mandatory fitness hearing for criminal defendants taking psychotropic drugs at the time of trial. *Id.* at 568.

18

Mem. at 22. Ebert has not established, however, that the outcome would have—or, likewise, should have—been different had his trial counsel investigated Esparza's statements and renewed the motion to suppress. Rather, as discussed above, the evidence supporting probable cause would have been largely the same. Even if Esparza had repudiated her statement to the police, the totality of the circumstances at the time of Ebert's arrest included (1) the interviewing officer's account of Esparza's statement, (2) Michael's statements about Maynard's activity on the day of the murders (Maynard's going up the stairs to the victims' apartment in the early morning, the disposal of Maynard's blood-stained boots, and Brasher's suspicious $50 gift to Michael), and (3) Maynard's comment to Michael that Ebert was one of three people involved in the murders. Taken together, it was not unreasonable for the police to rely on Michael when he reported Maynard's statement that Ebert was involved. That Michael's natural interest would have been to say nothing so as to protect his mother adds support to this conclusion. Thus, the court concludes that Ebert's Fourth Amendment claim is not meritorious.

Taking another tack, Ebert argues that at least he is entitled to an evidentiary hearing. He relies on *Hampton*, 347 F.3d 219, where the Seventh Circuit affirmed the district court's grant of the writ in large part because habeas petitioner Hampton's attorney had unreasonably failed to interview several potential defense witnesses. The Seventh Circuit explained that under the pre-AEDPA standards which were applicable at the time the district court reviewed Hampton's petition, "an evidentiary hearing on a habeas petitioner's claim is required if the petitioner has alleged facts that would entitle him to relief and the state courts, for reasons beyond his control, did not consider his claim in a full and fair hearing." *Id.* at 234. Here, as explained above, Ebert has not alleged facts that would entitle him to relief. Moreover, as the respondent points out,

"the state courts *did* consider both his claims and the 'new' evidence supplied by Esparza in full and fair state court hearings." Respondent's Mem. at 23. Indeed, the appellate court considered both of Esparza's statements in some detail and found that the facts relating to the issue of probable cause for Ebert's arrest would not have been substantially different even if defense counsel had interviewed Esparza and renewed the motion to suppress.

Ebert further argues that the Illinois Appellate Court, when faced with directly contradictory claims, improperly made credibility determinations concerning "the pretrial testimony of Detective Graf and the proffered testimony of Mrs. Esparza." Petitioner's Mem. At 24. Ebert contends that even if his arrest had been made after a warrant had been issued by a neutral magistrate, "the evidence concerning Esparza's ability to hear and discern that only Maynard could be overheard was sufficient to have ordered a hearing to determine whether the claims of the arresting officers regarding Ebert's involvement were false or the product of a reckless disregard for the truth." *Id.* (citing *Forman* v. *Richmond Police Dep't*, 104 F.3d 950, 963–64 (7th Cir. 1997)).

In *Forman*, a civil rights rather than a habeas case, the Seventh Circuit reiterated that "where the defendant makes a *substantial preliminary showing* that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is *necessary to the finding of probable cause*, the Fourth Amendment requires that a hearing be held at the defendant's request." 104 F.3d at 963–64 (quoting *Franks* v. *Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978)) (emphasis added).

Here, however, Ebert has made less than such a "substantial showing." One of Esparza's statements is a signed, handwritten note stating that the four individuals who went into the basement apartment were James Maynard, John Ebert, Sharon Brasher, and Michael Brasher, but "Robert English was not there or with them, and I talked to Sharon Brasher about the persons present at this time, and she related that only Jake [Ebert] and Ike [Maynard] were present with her." Petitioner's Mem. at 41 (unnumbered exhibit). That Esparza saw Michael Brasher as opposed to English enter the apartment would not call into question whether Ebert was present for the conversation that Esparza overheard from the window; indeed, her statement reaffirms Ebert's presence. The other statement, typed and *unsigned*, appears to be the notes of an interview with Esparza.[9] That document states that after Esparza saw Maynard, Ebert, Sharon Brasher, and Michael Brasher enter the basement apartment,

> she heard 2 male voices and 1 female talking, one male which she recognized as Ike said "do you all know how a pig bleeds if you slit his throat." There was another male voice which all I heard is "yea and" and that's when Sharron started to laugh outloud, which at the time my husband told me to close the window and don't get involved. She did not hear or tell the police that she heard any conversation regarding robbery or murder.

Petitioner's Mem. at 42 (unnumbered exhibit). On the one hand, this document contradicts the detectives' statements, made at the suppression hearing prior to the first trial, that the conversation Esparza overheard included discussion by the participants of their having robbed and killed two old men. On the other hand, it confirms Ebert's presence at that conversation and

---

[9] The document begins, "In my interview with Dolores Esparza on Monday, March 22, 1993, she related to me the following . . . .," but the identity of the interviewer is not readily apparent. Petitioner's Mem. at 42 (unnumbered exhibit).

the participants' discussion of how a pig bleeds when its throat is cut.[10]  Moreover, Esparza's

statement, one of two bases on which the Illinois courts relied to find probable cause for Ebert's

arrest, was not clearly necessary to a finding of probable cause, as discussed above.

Finally, in his reply brief, Ebert argues that the situation in this case is similar to that

which the Seventh Circuit faced in *Owens*, "where the police actually sought a warrant as they

should unless time does not permit" and "the court dismissed as superfluous that the search

produced reliable evidence of guilt." Petitioner's Reply at 3 (citing *Owens*, 387 F.3d at 608).  In

*Owens*, the "warrant pursuant to which evidence (consisting mainly of cocaine, marijuana, and

guns) was used against Owens at his trial was based on a barebones affidavit, signed by a

detective, which stated that three months earlier an informant had bought 'a quantity of crack'

from Owens at a house believed to be Owens's residence." *Owens*, 387 F.3d at 608.  Because

defense counsel had failed to argue that it was Owens's house in which the evidence was found

(and thus failed to establish Owens's standing to assert a Fourth Amendment objection), the

district court denied Owens's motion to suppress. *Id.* at 607–08.  In holding that defense

counsel's failure to make what should have been a successful Fourth Amendment objection

constituted ineffective assistance of counsel, the Seventh Circuit explained, "The evidence was

overwhelming that it was indeed Owens's house in which the crack was found. . . .  Had

---

[10]  Ebert also suggests that "[i]t is more than unusual when the only piece of evidence is
an overheard conversation and it is not placed into a police report according protocol even
though allegedly relied upon to support the arrests of three murderers." Petitioner's Mem. at 20.
Ebert thus argues that the Illinois Appellate Court had no reason "to resist revisiting its earlier
legal analysis when serious allegations were made concerning the accuracy, if not the efficacy of
detective Graf's report of his interview." *Id.*  However, Ebert offers no authority, legal or
otherwise, to support his suggestion that because Esparza's statements were not documented in a
police report, they lack reliability.

[counsel] acknowledged that it was Owens's house, *the motion to suppress would have been granted and Owens would have been acquitted*." *Id.* at 608 (emphasis added).

Here, in contrast to *Owens*, it is far from clear that Ebert's motion to suppress would have been granted had trial counsel interviewed Esparza and renewed the motion to suppress his confession. Rather, the Illinois courts concluded that Ebert could not demonstrate prejudice, the second prong of the *Strickland* analysis, and thus could not establish ineffective assistance of counsel. This court finds little reason to believe that a renewed Fourth Amendment challenge would have been meritorious such that the Illinois Appellate Court's conclusion to the contrary could be considered erroneous or, beyond that, "well outside the boundaries of permissible differences of opinion." *Hardaway* v. *Young*, 302 F.3d 757, 762 (7th Cir. 2002).

## CONCLUSION

For the reasons discussed above, Ebert's petition for a writ of habeas corpus is denied. The clerk is directed to mail a copy of this memorandum opinion and order to the petitioner.

Dated: February 3, 2009        Enter: _____

                                              JOAN HUMPHREY LEFKOW
                                              United States District Judge

23